United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES E. CALDWELL, | No. C-05-3929 JCS |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS** |
| v. | |
| JOANNE B. BARNHART, | |
| Defendant. | |
| _____/ | **[Docket Nos. 16, 19]** |

## I.   INTRODUCTION

Plaintiff, Charles E. Caldwell, filed a complaint on September 28, 2005, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits under Title XVI of the Social Security Act. Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, or in the alternative, for an order remanding the matter for further administrative proceedings.

Plaintiff applied for disability benefits on December 30, 2002. The application was denied initially and on reconsideration. Plaintiff made a timely request for a hearing, and a hearing was held on May 20, 2004, in San Jose, California. At the hearing, testimony was taken from Plaintiff, a vocational expert, and Plaintiff's sister. Plaintiff was represented at the hearing by Cynthia Starkey, an attorney. On July 28, 2004, the ALJ issued a decision finding Plaintiff was not disabled as defined in the Social Security Act, and denying his request for benefits. This decision became final when the Appeals Council declined to review the ALJ's decision, on July 26, 2005.

Plaintiff filed a Motion for Summary Judgment on June 21, 2006, and the Commissioner filed a Cross-Motion for Summary Judgment on July 25, 2006. Plaintiff filed his Reply on

August 11, 2006. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND

### A.     Plaintiff's Background

Plaintiff was born on December 22, 1950. Administrative Record ("AR") at 31. Plaintiff competed 11th grade. AR at 77. In an Initial Mental Health Evaluation (hereinafter, "the Crowder Evaluation"), clinical psychologist Richard L. Crowder reports that Plaintiff told him he left school "due to being in jail." AR at 258.[1] According to Crowder, Plaintiff said he "did ok in school when he tried." *Id*. Plaintiff's high school transcript reflects that his grades included eight Bs (half of which were in physical education), fifteen Cs, six Ds and eleven Fs. AR at 122. Some of the English and reading courses appear to have been remedial courses. *See id*. Plaintiff received almost all of the Fs during the 1967-1968 school year. *Id*.

Between 1972 and 1975, Plaintiff worked as a warehouseman for Coast Envelope. AR at 73. He reports that during this time, he slipped and fell while at work, hurting his back. AR at 78. Subsequently, he found he was unable to work due to the pain, and the company doctor told him he should not perform that work anymore. *Id.* He then tried working in landscaping and as a porter, but found both jobs too painful. *Id*. Although the administrative record provides little information about Plaintiff's subsequent activities, it appears that he was in and out of prison after 1975 and was last released from prison in August 2003. *See* AR at 45, 256. According to the Crowder evaluation, Plaintiff was living with his sister, in Campbell, after he got out of prison, in August 2003. AR at 257.

In his application for Social Security Disability Benefits, Plaintiff listed his impairments as "back – degenerative discs" and "psych problems." AR at 54.

---

[1] Although the form is not dated, it refers to Plaintiff's most recent release from prison as August 6, 2003. The document also carries a fax header dated February 23, 2004, indicating that the form was completed sometime between those two dates, after Plaintiff had been released from San Quentin on parole.

2

**B.    Medical Evidence**

   **1.    Physical Health**

The administrative record contains numerous notations indicating that Plaintiff has complained of lower back pain for many years. *See*, *e.g.*, AR at 133, 136, 142, 214-223, 229, 235, 276. On October 17, 2003, Dr. Neena Madireddi conducted an orthopedic examination of Plaintiff. She noted that Plaintiff complained he had suffered from back pain since 1974 and that it is difficult for him to "lie, stand and move around." AR at 182. Plaintiff reported to Dr. Madireddi that he had tried hot packs and acupuncture, but that these treatments had not relieved his pain. *Id*. He said that he could "lift only 5 pounds [,]. . . walk one block, sit ten minutes and stand 5 minutes." *Id*. According to Dr. Madireddi, her examination showed no abnormalities as to Plaintiff's neck and upper extremities. *Id*. at 183. With respect to Plaintiff's back and lower extremities she noted "[f]orward flexion [was] 50% normal." *Id*. She continued, "[h]e reports severe discomfort with lumbar range of motion and prefers not to perform any further lumbar range of motion." *Id*. Dr. Madireddi concluded as follows:

> In my opinion claimant can lift and carry 20 pounds occasionally, and 10 pounds frequently. But he should avoid repetitive stooping, crouching, crawling activities; which can give pain to spine. No restrictions in climbing steps, kneeling or balancing. Stand and walk at least 6 hours cumulatively and sit 6 hours cumulatively. A cane is not medically indicated. No restrictions in speech or hearing.

AR at 184.

The following week, on October 24, 2003, Plaintiff's spine was x-rayed. The radiologist, Dr. Charles Fielder, described the e-ray results as follows:

> LUMBOSACRAL SPINE: AP and lateral views: On the AP view, the sacriliac joints are open. There, however, seems to be only forward lumbar vertebral bodies. There are widespread hypertrophic spurring changes throughout the entire lumbar spine and lower dorsal spine. There are prominent degenerative osteoarthritic changes involving the lower posterior lumbosacral articulations, particularly on the left. On the lateral view, the transitional type upper sacral vertebra shows a very narrow disc space between it and L4. The disc is narrowed with vacuum visualization and prominent hypertrophic spurring anteriorly and posteriorly. There are prominent osteoarthritic changes of the posterior articulations at this level. All of the lumbar vertebral disc spaces show some narrowing with evidence of anterior hypertrophic spurring and posterior spurring particularly at the level of L2-3 where

3

> the posterior spurring is quite prominent. There appears to be an old healed partial compression, involving D12 and there are prominent anterior spurring changes throughout the lower dorsal spine.
>
> IMPRESSION: There are extensive osteoarthritic spurring changes throughout the lumbar and dorsal spine, as described above. There is widespread disc narrowing and osteoarthritic spurring, most prominent at L4-S1 and also at L2-3, as described above.

AR at 185.

### 2. Mental Health

Plaintiff's medical records indicate a history of depression, dating back to his childhood. AR at 178-179. In 1992, Plaintiff was hospitalized after attempting suicide. AR at 152, 178, 257. He has reported that since receiving a head injury, at the age of nine, he has heard voices. AR at 168, 153, 179. Prison records indicate that Plaintiff's depression ranged from "mildly depressed" (AR at 244) to "severe" or "major depressive disorder." AR at 168, 250. In 2001, Plaintiff was taking Zyprexa and Zoloft for his depression. AR at 250-251.

A mental health evaluation was completed on January 23, 2003 by San Quentin psychologist Lynne Reed. AR at 152-154. Reed rated Plaintiff's "reality contact" as "marginal," a noting that Plaintiff was bothered by voices in his head whispering and saw "things flying – little animals." AR at 153. She stated that Plaintiff seemed "somewhat subdued, guarded," "consistent with [previous diagnosis] of schizoaffective disorder." *Id*. She described Plaintiff's intellectual functioning as "low average (estimated)." *Id*.

On October 7, 2003, psychologist Tania Shertock conducted a psychological assessment of Plaintiff. She noted that his attitude was "pleasant and cooperative" but that his mood was "depressed." AR at 179. She described his thought processes as "grossly logical, organized and coherent [revealing] no loosening of associations, circumstantiality, or tangentiality." *Id*. Although Plaintiff's "Fund of General Information" was described as "[b]elow average," his "Insight/Judgment" were rated as "[w]ithin normal limits." *Id*. Dr. Shertock stated that Plaintiff's social functioning was significantly impaired and that although he "described relations with supervisors and coworkers as OK," his relations with others were "poor as he is paranoid and avoids others in general." AR at 180. She assigned Plaintiff a Global Assessment of Functioning ("GAF")

1  score of 60.[2]  AR at 181.  Plaintiff received a score of 64 on the Wechsler Adult Intelligence Scale,

2  placing him in the mild range of mental retardation.  AR at 180.  Dr. Shertock noted, however, that

3  "[t]his is a slight underestimate of his current intellectual functioning given variable motivation and

4  low tolerance for frustration."  *Id*.  She concluded, "[t]he overall clinical presentation was of an

5  individual with signs of major depression with psychotic features, an antisocial personality disorder

6  and a cognitive disorder.  There were no signs of a major anxiety or somatoform disorder."  *Id*.

7  A "Client Case Note" dated January 25-26, 2004 by psychiatrist Ann Reichardt states:

8  "[t]here appears to be an element of depression and we agreed to a trial of antidepressant.  His mood

9  and affect are moderately depressed.  There is no [suicidal ideation], no psychotic process."  AR at

10  252.  An additional handwritten note on the report states that Plaintiff's diagnosis is "major

11  depression [with] psychotic features" but that "he is not acutely psychotic or suicidal."  *Id*.

12  **C.    Plaintiff's Pain and Daily Activities  Questionnaire**s

13  Plaintiff completed a Pain Questionnaire and a Daily Activities Questionnaire on

14  September 9, 2003.  AR at 100-109.  In the Pain Questionnaire, he wrote that he experiences "sharp

15  stabbing pains" in his lower back "every day."  AR at 100.  He stated that the pain may last 15-20

16  minutes or 24 hours, and that for the last three years, he has been taking codeine up to four times a

17  day to control the pain.  *Id*.  According to Plaintiff, the pain is brought on by "walking, laying,

18  standing, and moving around," and because of the pain he "cannot do any activities."  AR at 102.

19  He stated that his friends assist with errands and that "all chores are done by roommate."  *Id*.  He

20  stated that he cannot walk more than a block and he cannot stand or sit for more than 10 minutes at a

21  time. *Id*.

---

24  [2] The Global Assessment of Functioning Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." On the scale, a score
25  of 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting")." A score of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial
26  speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning." A score of 61-70 is described as "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR
27  some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within household), but generally functioning pretty well, has some meaningful interpersonal relationships."
28  *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed. Text Revision 2000) at 34.

United States District Court
For the Northern District of California

Similarly, in his Daily Activities Questionnaire, Plaintiff wrote that he experiences "severe back pain" and muscle spasms. AR at 104. He stated he requires assistance tying his shoes, washing his back and with "lifting, bending [and] reaching." *Id*. He stated that he does not do chores, that a friend does all of his grocery shopping and that his only activity is watching television. AR at 105.

### D. Sister's Function Report

On September 9, 2003, Plaintiff's sister, Beverly Farah, completed a Function Report. AR at 90-98. She stated that she saw Plaintiff on weekends and that he was at that time living in an apartment with friends. AR at 90. Farah stated that Plaintiff's roommate helped him to tie his shoes and with bathing, and that it was "very difficult [for Plaintiff] to tie shoes [or do] anything that requires bending." AR at 91. She also stated that Plaintiff had trouble with "long walks and bus rides." *Id*. She further stated that Plaintiff "cannot reach or bend [without] excessive pain." AR at 92. She also stated that Plaintiff has difficulty sleeping and cannot drive because of muscle spasms. AR at 91, 93. She stated that Plaintiff could not lift more than 10 pounds or sit or walk for more than 10 minutes. AR at 95. She stated that Plaintiff was completely unable to squat, bend, kneel or reach. *Id*.

### E. The Hearing

At the May 20, 2004 hearing, the ALJ heard testimony from Plaintiff, his sister and a vocational expert ("VE"). Plaintiff testified that he had taken some remedial reading and special education classes while in school. AR at 291 - 292. He stated that he had taken the high school equivalency exam, but had failed twice, and that he had failed the written test to obtain a driver's license three times. AR at 292-293. He stated that he was living with his sister, Beverly Farah. AR at 297. Plaintiff testified that in 1997 he had worked for another sister, sitting in a store watching for shoplifters, for between five and seven months. AR at 299.

When asked about his back pain, Plaintiff testified that his back was "killing [him]" and rated his pain as a nine on a scale of one to ten. AR at 294. He testified that he was going to back therapy and taking pain medication, and that he was on a waiting list to see a doctor. AR at 295-296. He stated that he has used a cane for three to four years and that he has trouble sleeping because of his

back pain. AR at 298. He testified that he can walk only 10 minutes at a time and sit only 15 minutes at a time. *Id*. He stated that he watches television lying down most of the day because his back is less painful when he lies down. AR at 297.

Regarding his mental health, Plaintiff testified that his depression and anxiety were getting worse because he could no longer talk to Dr. Wrighthard, of the Department of Corrections, who had previously treated him. AR at 296. Plaintiff stated that he hears voices whispering "like somebody is having a party in [his] head" and that he stays in the house all the time because he feels as if someone is watching him. AR at 297.

Plaintiff's sister, Beverly Farah, testified that Plaintiff lived with her and had been living with her for almost eight months. AR at 302. She testified that Plaintiff seemed "very depressed" and he was "depressed and crying and . . . not wanting to do anything." AR at 303-304. She also testified that she heard Plaintiff having conversations with himself in his room. AR at 303.

Finally, VE Darlene McQuary testified. The ALJ and Plaintiff's attorney posed the following hypotheticals:

| | |
|---|---|
| ALJ: | So if we assumed a person . . . the same age, education and work experience as the claimant and if we assume . . . that the person can occasionally lift 20 pounds, frequently 10, could stand about six hours or sit about six hours in an eight hour day, I take it such a person would be able to perform that past work [as a security guard]? |
| VE: | Yes. |
| ALJ: | And would there also be other jobs existing in the national or regional economy such a person could perform? |
| VE: | Such a person could work as a clerk/cashier. In the region 52,000 such jobs, Such person could work as a parking lot attendant. In the region, 1,206 such jobs. Such a person could do assembly. And 121,000 in the region, both sedentary and light. |
| ATTY: | . . .If we take a claimant, same age, education, work experience as this claimant and assume that he has impaired memory range and that he scored less than 50 in Wexler memory score, which is less than the [first] percentile, would he be able to perform any of these jobs you mentioned. |
| VE: | No. |
| ATTY: | And then, another hypothetical, same age, education, work experience, if he scored on the Wexler in the 60s, basically, the full score was 64, and that places him in the mild range of mental retardation, would he be able to perform any of the jobs you mentioned? |

7

1   VE:             No, not in the competitive environment.

AR at 301.

### F. The ALJ's Five-Step Analysis and Findings of Fact

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if her physical or mental impairments are of such severity that she is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If he is, the Commissioner finds that the claimant is not disabled, and the evaluation stops. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied at this step. If it is determined that the impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has ratified as disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers whether the

claimant, in light of his impairments and residual functional capacity ("RFC"), can still perform work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still perform previous work, he is found not to be disabled. If the claimant cannot perform past relevant work, the Commissioner performs the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can adjust to other work in the national economy. *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995). A claimant who is found able to make the adjustment to other work is not considered disabled, and will not receive disability benefits. 20 C.F.R. § 404.1520(f).

At Step One, the ALJ in this case found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date. AR at 20.

At Steps Two and Three, she found that Plaintiff's degenerative disc disease and depression are severe but not severe enough to meet or equal a listed impairment. AR at 17, 20. On the other hand, she found that Plaintiff's intellectual functioning was not sufficiently impaired to be considered "severe" and also did not meet or equal a listing. AR at 18. With respect to the latter finding, the ALJ pointed to evidence in the record that Plaintiff had performed satisfactorily in school when he tried. *Id*. The ALJ discounted the Wechsler score of 64 in Dr. Shertock's report, stating, "the testing psychologist noted that the claimant exhibited poor effort on the tests and the scores represent an underestimate of his current intellectual functioning." *Id*.

At Step Four, the ALJ considered Plaintiff's RFC. She adopted the limitations found by Dr. Madireddi, that is, that Plaintiff could frequently lift/carry 10 pounds, occasionally lift/carry 20 pounds, stand/walk for a total of 6 hours in an 8-hour workday, sit for a total of 6 hours in an 8-hour workday and occasionally stoop, crouch, or crawl. AR at 18. The ALJ noted that the only "positive clinical finding" in Dr. Madireddi's report was "decreased flexion in the lumbar spine." *Id*. She acknowledged the X-ray results but discounted their significance, stating, "X-rays performed in October 2003 show degenerative changes commonly found in individuals of the claimant's age . . . , but the record contains no evidence of any herniated discs." *Id*. The ALJ did not specifically address Plaintiff's testimony regarding his back pain. She did state generally in her "Findings,"

9

however, that "[t]he undersigned finds the allegations regarding the severity of his limitations are not totally credible for the reasons set forth in the body of the decision." AR at 20.  She did not mention anywhere in the decision the evidence provided by Plaintiff's sister in her Function Report regarding the impact of Plaintiff's pain on his daily activities.

At Step Five, the ALJ concluded, based on the testimony of the VE, that Plaintiff could work as a clerk/cashier, parking lot attendant, or assembly worker.  AR at 20.

### D. Contentions of the Parties

Plaintiff asserts that the ALJ erred in the following respects: 1) she improperly concluded that Plaintiff's intellectual functioning was not a severe impairment and further erred in concluding that this impairment did not meet Listing 12.05, governing Mental Retardation; 2) she improperly failed to address Plaintiff's pain testimony or provide reasons for rejecting it; and 3) she improperly failed to provide any reasons for rejecting the testimony of Plaintiff's sister.

The Commissioner responds that the ALJ's findings as to Plaintiff's intellectual functioning are supported by substantial evidence.  With respect to Plaintiff's pain testimony, the Commissioner argues that the ALJ's finding that Plaintiff's allegations were not "totally credible for the reasons set forth in the body of the decision" was sufficient specific to meet  legal requirements.  Finally, as to the testimony of Plaintiff's sister, the Commissioner asserts that the ALJ was not required to provide reasons for rejecting her testimony because it was not inconsistent with the ALJ's conclusions and, in any event, Plaintiff's sister was not sufficiently familiar with his activities because she stated in her questionnaire that she saw him only on weekends.

## III. ANALYSIS

### A. Legal Standard

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere scintilla," *id.*, but "less than a preponderance."  *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988).  Even if the

Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

**B.     The ALJ's Analysis re Intellectual Functioning**

Plaintiff asserts that the ALJ's finding at Step Two that his limitations in intellectual functioning are not severe is not supported by substantial evidence. The Court disagrees. The ALJ cited to evidence that Plaintiff received some "pretty decent grades" in High School and that Plaintiff himself admitted that when he made an effort in school, he did "alright." AR at 18 (citing AR at 122, 258). The ALJ's conclusion that Plaintiff's poor performance in school was more a reflection of effort than of his limited intellectual functioning also finds support in the fact that most of Plaintiff's failing grades were concentrated in a single semester. The ALJ also pointed out that the Wechsler score obtained by Dr. Shertock was of questionable validity because, according to Dr. Shertock's own report, the score was an " underestimate of Plaintiff's current intellectual functioning." AR at 18. While the ALJ's summary of Dr. Shertock's reasons for reaching this conclusion may have somewhat overstated the degree to which Dr. Shertock questioned the test results, the Court cannot say that it was unreasonable, in light of Dr. Shertock's reservations, for the ALJ to reject the test results on the basis that they were unreliable. Therefore, the Court concludes that the ALJ's finding of non-severity as to Plaintiff's intellectual functioning is supported by substantial evidence. For this reason, the Court also rejects Plaintiff's assertion that the ALJ erred in concluding that this impairment does not meet Listing 12.05.

**C.     The ALJ's Step Four Analysis Re Plaintiff's Pain Testimony**

Plaintiff asserts that the ALJ did not provide adequate reasons for rejecting his pain testimony. The Court agrees that the ALJ erred in this respect.

In developing a claimant's RFC, the ALJ must consider limitations imposed by all of the claimant's impairments. SSR 96-8p. The ALJ must also consider "the impact of any related symptoms, including pain," when establishing the RFC. 20 C.F.R. § 404.1545; *see also* 20 C.F.R.

11

1  § 404.1529(c)(4) (addressing how pain is assessed in determining ability to work). If a plaintiff
2  produces medical evidence of underlying impairments consistent with his complaints and there is no
3  affirmative evidence that he is malingering, the ALJ's reasons for rejecting the testimony must be
4  clear and convincing. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). Social
5  Security Regulations state that "the finding on credibility of an individual's statements cannot be
6  based on an intangible or intuitive notion about an individual's credibility," but must be grounded in
7  the evidence and articulated in the ALJ's decision. SSR 96-7p; *see also Varney v. Sec'y of Health*
8  *and Human Servs.*, 846 F.2d 581, 584 (9th Cir. 1988), rev'd on other grounds upon reh'g, 859 F.2d
9  1396 (9th Cir. 1988).

10  Here, the ALJ found that Plaintiff's degenerative disc disease was a severe impairment.
11  Further, x-ray results revealed "extensive osteoarthritic spurring changes throughout the lumbar and
12  dorsal spine . . . [and] widespread disc narrowing and osteoarthritic spurring, most prominent at L4-
13  S1 and also at L2-3." AR at 185. In light of this medical evidence of Plaintiff's underlying
14  impairment, and in the absence of evidence that Plaintiff was malingering, the ALJ was required to
15  give clear and convincing reasons for rejecting his pain testimony. She did not do so. The only
16  statement that arguably even addresses Plaintiff's pain testimony is the boilerplate statement at the
17  end of the decision that simply states that Plaintiff's allegations were not "totally credible for the
18  reasons set forth in the body of the decision." The ALJ does not, however, address anywhere in the
19  body of the decision why Plaintiff's specific testimony regarding his pain – especially his muscle
20  spasms, his limited ability to sit, stand or walk for any extended periods or to reach or bend at all
21  without severe pain – is not credible. Particularly troubling is the ALJ's failure to address in a
22  meaningful way the results of the x-ray, which was done after Dr. Madireddi's evaluation and was
23  never considered by Dr. Madirredi. The ALJ's suggestion that this x-ray could be discounted
24  because "degenerative changes [are] commonly found in individuals of claimant's age" is
25  insufficient because it does not address whether that condition is consistent with the pain Plaintiff
26  has testified to experiencing.

27  The ALJ erred in rejecting Plaintiff's pain testimony without providing clear and convincing
28  reasons for doing so. As a result, the RFC – and the conclusion that Plaintiff is not disabled that is

1  based on the RFC – are not supported by substantial evidence.

### D. The ALJ's Step Four Analysis re Sister's Function Report

Plaintiff asserts that the ALJ committed reversible error by failing to provide any reasons – or even address – the testimony of his sister regarding his limitations. Again, the Court agrees.

In the Ninth Circuit, it is established that an ALJ "need not discuss *all* evidence presented," but rather must explain only why "significant probative evidence has been rejected." *Vincent v. Heckler*, 739 F.2d 1393. In *Vincent*, the court affirmed the decision of the ALJ, even though he did not discuss in his decision lay testimony about the claimant's impairments, because the court found that the ALJ's findings were supported by medical evidence that contradicted the lay testimony. *Id*. In a subsequent decision, the Ninth Circuit explained that in *Vincent*, the ALJ was not required to provide reasons for disregarding the lay testimony because the lay witness purported to make a medical *diagnosis* – something lay witnesses are not competent to testify about – and, therefore, the evidence was not "probative." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

In contrast, lay witnesses *are* competent to testify about how a claimant's symptoms affect his ability to work. *Id*. For example, in *Nguyen*, the court held that the ALJ erred when he failed to consider testimony by both the claimant and his wife that the claimant had a serious coughing problem. *Id*. Consequently, the ALJ did not include in his hypothetical to the vocational expert a limitation reflecting this symptom. *Id*. The court held that the ALJ could only reject the testimony of the lay witness (the claimant's wife) if he gave reasons that were "germane" to that witness. *Id*. (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)). The court further held that because the ALJ did not include the coughing limitation in the hypothetical to the vocational expert, the conclusion that there was work available in the national economy that the claimant could perform was not supported by substantial evidence. *Id*.

Here, as in *Nguyen*, Plaintiff offered probative lay testimony regarding the impact of Plaintiff's symptoms on his ability to work. In particular, he offered the testimony of his sister that he needed assistance tying his shoes and washing himself because bending was too painful and that he could not sit or stand for any significant period of time because of extreme back pain. This

1 testimony clearly conflicts with the ALJ's finding that Plaintiff can sit or stand for up to six hours at
2 a time and can occasionally stoop, crouch, and crawl.

3 The Court rejects the Commissioner's assertion that because Plaintiff's sister stated in her
4 questionnaire that she sees him on weekends, and not every day of the week, the ALJ could ignore
5 the evidence entirely on the basis that it was non-probative.  The Court finds no authority suggesting
6 that third party testimony regarding a claimant's daily activities is probative only if he or she
7 observes the claimant on *every* day of the week rather than just certain days of the week.  Further,
8 there is evidence in the record that following his release from San Quentin in August 2003, Plaintiff
9 did, in fact, live with his sister for some period of time.  *See* AR at 257.

10 The ALJ erred in failing to address the lay-witness testimony of Plaintiff's sister in
11 determining Plaintiff's RFC.  As a result, her finding that there are jobs in the national economy in
12 significant numbers that Plaintiff can perform is not supported by substantial evidence.  *See Nguyen*,
13 100 F.3d at 1467; *see also Crowell v. Apfel*, 1999 WL 13710 (N.D. Cal.) (holding that ALJ erred by
14 failing to give reasons for discounting lay testimony).

15 **IV.   CONCLUSION**

16 For the foregoing reasons, the Court GRANTS in part and DENIES in part Plaintiff's motion
17 for summary judgment and GRANTS in part and DENIES in part Defendant's motion for summary
18 judgment.  The Court reverses the ALJ's decision with respect to Plaintiff's degenerative disc
19 disease only and remands Plaintiff's claim for further administrative proceedings consistent with this
20 opinion.  Upon remand, the ALJ is instructed to evaluate Plaintiff's own pain testimony and the lay
21 testimony of Beverly Farah as its relates to Plaintiff's RFC.  Should the ALJ reject the testimony of
22 Plaintiff and/or his sister, she shall provide written reasons for doing so that are supported by
23 substantial evidence.  In the alternative, should she determine that Plaintiff's RFC must be revised to
24 include additional limitations, she shall proceed to Step Five to reevaluate whether, in light of these

additional limitations, Plaintiff can perform any jobs that are available in significant number in the national economy.

IT IS SO ORDERED.

Dated: December 20, 2006

JOSEPH C. SPERO
United States Magistrate Judge